UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BOBBY ALLEN WILLIAMS,

       Petitioner,

v.                                    Case No. 2:14-cv-00012
                                       HON. ROBERT HOLMES BELL

CATHERINE BAUMAN,

       Respondent.
_____/

**REPORT AND RECOMMENDATION**

Petitioner Bobby Allen Williams filed this petition for writ of habeas corpus challenging his jury conviction for three counts of armed robbery (MCL § 750.529), first-degree home invasion (MCL § 750.110a(2)), false report of a felony (MCL § 750.411a(1)(b)), possession of marijuana (MCL § 333.7403(2)(d)), and possession of a firearm during the commission of a felony (felony firearm) (MCL § 750.227b). Petitioner was convicted as a fourth-habitual offender (MCL § 769.12). Petitioner was sentenced to concurrent sentences of 35 to 60 years for the armed robbery and first-degree home invasion convictions, and 10 to 15 years for the false report of a felony conviction, to be served consecutive to 2 years in prison for the felony firearm conviction. Petitioner's sentence is consecutive to his prior sentences (MCL § 768.7a), since Petitioner was on parole when he committed these offenses. The trial court fined Petitioner $500 for possessing marijuana. The respondent has filed an answer and has complied with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts. The parties have briefed the issues and the matter is now ready for decision.

The Michigan Court of Appeals set forth the facts in this case:

On the evening of December 8, 2008, Katie Funk, Andrew Casali, and Lukas Gallegos were at the apartment where Casali, Gallegos, and their roommate Nathan Darling lived. An intruder with a gun entered the apartment and told Funk, Casali, and Gallegos to get on the ground. The intruder demanded that they hand over any valuables that they had. According to Casali and Gallegos, the intruder repeatedly threatened to kill them. While pointing a gun at Gallegos, the intruder patted him down; however, the intruder did not take anything from Gallegos because he had nothing of value on him. The intruder pointed the gun at Funk's head, and Funk gave him her student identification card and debit banking card. The intruder then went into another room, where he found and took Darling's computer and camera. When he came back into the room where Funk, Casali, and Gallegos were, the intruder then demanded Casali's valuables, and Casali gave the intruder his cell phone. Before leaving, the intruder told Funk, Casali, and Gallegos to stay on the ground and threatened to kill them if they called the police.

After the intruder left, Funk called the police. When the police arrived, the first officer at the scene, Grand Rapids Police Department Officer Gregory Rekucki, noticed footprints that came on to the porch from the east and then exited the porch to the south. So, before entering the apartment, Officer Rekucki preserved one of the footprints by putting a box over it. According to Officer Rekucki, the print looked like a boot print rather than a shoe print. The witnesses told him that the intruder was wearing all black clothing and boots.

Grand Rapids Police Department Officer Darren Geragthy arrived at the scene and used a police canine to track a set of boot prints from the crime scene to the front of Williams' sister, Latasha Elliot's, house. Officer Geragthy testified that he was able to verify that the dog was tracking the same, single set of footprints because he could see them in the snow. Officer Geragthy testified that when they got to the sidewalk in front of Elliot's house, he noticed that the prints had been disturbed: they had been covered up by another set of footprints made by a pair of Nike tennis shoes. Officer Geragthy also testified that the snow in this area appeared to have been shoveled. Officer Geragthy testified that, despite the disturbed footprints, his tracking dog took him around to the back of Elliot's house and continued up to the back door.

As police officers were about to approach Elliot's house, they received a "shots fired" call from dispatch for a location a few blocks away. However, an officer in the area where the shots were supposedly fired reported that he had heard no shots fired. The officers then approached Elliot's home. Elliot answered the door, and

the officers noticed Williams behind her. The officers asked Williams to step outside, where they searched him and found marijuana, as well as Funk's student ID and debit card, and Casali's cell phone. The officers did not find a gun on Williams. The police arrested Williams for possession of marijuana and placed him in a police vehicle. Officer Geragthy also testified that he saw Williams when officers escorted him out of Elliot's house, and the shoes impressions that he made then matched the shoe impressions that had disturbed the boot prints he had been tracking.

The police then searched Elliot's house. They did not find a gun or any of articles of clothing resembling those that the intruder was allegedly wearing. However, the police found a backpack under a child's bed, which contained a laptop and camera. Darling later identified the laptop and camera as the property stolen from his room.

According to Grand Rapids Police Department Officer Frank Barthel, Williams said that the person they were looking for was Antoine Davis, who had just left. Also, Williams said that the property that the police found on his person and in the house were items that he was holding for Davis. Officer Barthel testified that Williams was wearing Nike Air Jordan shoes when he was arrested.

About 25 to 30 minutes after the robbery, police officers took Funk, Casali, Gallegos, and Darling to Elliot's house in an effort to make an identification of the intruder. At the time of the identification procedure, Williams was handcuffed, standing next to a police car with a light shone on him.

Funk testified that, before arriving at the house where she identified Williams, a police officer told her that they had tracked and found the man who robbed them and that they wanted her to identify him. Funk explained that at the time she made the identification, she and Darling were sitting in the backseat of a police car together and that Williams was about 20 feet away from her. She never got out of the police car, but was able to view Williams through the front windshield of the vehicle. She testified that Williams was wearing earrings when she identified him. Funk testified that she did not hesitate to identify Williams as the intruder; she looked at Williams for "a good 15 seconds" before she identified him and there was no question in her mind that he was the robber. Funk denied that the police or anyone else pressured, threatened, or influenced her in any way to identify Williams as the robber. Funk testified that she was certain and had no doubt that Williams was the man who robbed her.

Casali testified that before going to the show-up, the police told him and Gallegos that they were going to identify someone. But Casali denied that the police or anyone else pressured, threatened, or influenced him in any way to identify Williams as the robber. Casali also denied that the police told him that the man presented to him for identification was found in possession of the stolen items. Casali testified that at the time of the identification procedure, he and Gallegos were sitting in the back of a police car, looking at Williams through the windshield. Casali explained that the windshield was clean and that he could see "perfectly." Casali testified that he had no hesitation when he identified Williams as the intruder. According to Casali, "I knew right away that was the person I had just seen. I probably made the identification within ten seconds." There was no doubt in Casali's mind that Williams was the perpetrator.

Gallegos confirmed that at the time of the identification procedure, he and Casali were sitting in the back of a police car, looking at Williams through the windshield. Gallegos also confirmed that he identified Williams as the intruder. Gallegos testified that before arriving at the house where he identified Williams, the police told him that a canine unit had followed some tracks and that they had found someone. However, Gallegos denied that the police told him that he had to identify Williams as the intruder, and he also confirmed that he freely identified Williams. Gallegos testified that there was no doubt in his mind that Williams was the intruder.

At trial, Funk, Casali, and Gallegos identified Williams as the intruder who robbed them on December 8, 2008. Funk testified that Williams was in the apartment for a total of five minutes. According to Funk, at the time of the robbery, Williams was wearing a black, hooded sweatshirt; black pants; and tan, Timberland-style boots. She said that she "distinctly" remembered Williams' eyes and eyebrows and that he had earrings. She also remembered his nose, the shape of his lips, and the shape of his face. Casali he said that he remembered what the intruder's eyes and eyebrows looked like, and he remembered the intruder's facial structure and that he had two earrings in his ears. Casali also testified that at the time of the robbery, the intruder was wearing leather, "carpentry" boots. At the time of the robbery, Gallegos noticed that the intruder was wearing black pants, a black sweatshirt, and earrings.

Williams' sister, Elliot, testified at trial that on the evening of December 8, 2008, Williams was at her house watching her children. She returned home around 7 p.m. Williams was there for about 20 minutes, and then left to go to the store. He was gone about 20 minutes, and then returned home around 8 p.m. Elliott testified that

> Williams later left the house again to go give someone a haircut. According to Elliot, Williams returned home later, but she was not sure what time; however, it was before the police arrived. Elliot explained that after he came back home this time, Williams then went outside for about 15 minutes to shovel snow. Elliot testified that Williams was wearing Nike tennis shoes. Elliot testified that, to her knowledge, Williams did not own a pair of Timberland boots. She confirmed that Williams did wear studstyle earrings "[o]n occasion." Elliot testified that she was not aware of anyone, except the police, coming into her house that evening. Specifically, Elliot denied that Antoine Davis came to her home that evening.
>
> Williams admitted to prior convictions of armed robbery and carjacking, for which he was sentenced to five years in prison when he was 15 years old. However, he denied committing the robbery in this case. He stated that, on the night in question, he was shoveling snow in front of Elliot's house when Davis approached him. Williams admitted that he purchased marijuana from Davis. During the purchase, Davis asked Williams to hold a backpack for him; but Williams did not know what the bag contained. Williams put the backpack under a bed so that Elliot's children would not get into it. Williams testified that Davis left an ID, debit card and cell phone on the porch. Williams did not know that the items were stolen, but he put them in his pocket so that he could put them in Davis' backpack. Also, he testified that he did not own or wear Timberland boots.
>
> According to Williams, he was smoking marijuana on the front porch, when he saw the police walking around. After seeing the police, Williams made a false report of "shots fired" because he was worried about the marijuana smell attracting the police. Officer Rekucki testified that it was later confirmed that the call came from Williams' cell phone. At the time of his arrest, Williams told the police that he could give them a phone number for Davis. However, at trial, he admitted that he never again tried to convey that information to his attorney or anyone else.

Michigan Court of Appeals decision, PageID.351-354.

> Petitioner alleges that:
>
> I. The identification procedure was impermissibly suggestive, and the admission of the identification violated due process.
>
> II. The jury was not properly instructed on eyewitness identification, in violation of the Fourteenth Amendment.

III. Trial counsel was constitutionally ineffective.

IV. Appellate counsel was constitutionally ineffective.

In April of 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) became effective. Because this petition was filed after the effective date of the AEDPA, this Court must follow the standard of review established in that statute. Pursuant to the AEDPA, an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This provision marks a "significant change" and prevents the district court from looking to lower federal court decisions in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). To justify a grant of habeas corpus relief under this provision of the AEDPA, a federal court must find a violation of law "clearly established" by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). The Supreme Court held that a decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* A state court decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies

the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 412. Rather, the application must also be "unreasonable." *Id.* Further, the habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable. *Id.* at 410 (disavowing *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996)). Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy,* 160 F.3d 1131, 1134 (6th Cir. 1998). The habeas corpus statute has long provided that the factual findings of the state courts, made after a hearing, are entitled to a presumption of correctness. This presumption has always been accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). Under the AEDPA, a determination of a factual issue made by a state court is presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 527 U.S. 1040 (1999).

Respondent argues that Petitioner's first and second claims, as well as part of his third claim are procedurally defaulted. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).

To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation or can show actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485; *Lucas v. O'Dea*, 179

F.3d 412, 418 (6th Cir. 1999); *Rust*, 17 F.3d at 160-61. To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

In Petitioner's first claim he asserts that his pre arrest identification was unconstitutionally suggestive. The Michigan Court of Appeals rejected this claim under a plain error analysis because Petitioner failed to preserve this issue for appeal. In this circuit, "plain error review does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice").

The Michigan Court of Appeals concluded that the identification procedure did not violate Petitioner's rights.

> Here, the evidence shows that the on-the-scene procedure used in this case was indeed suggestive. Williams was the only suspect shown to the witnesses, and the police indicated to Funk and Gallegos that the man they were going to identify was a man that the police had tracked from the scene of the robbery. However, we disagree that, under the totality of the circumstances, the on-the-scene procedure was so unnecessarily suggestive that it led to a substantial likelihood of misidentification.
>
> The testimony established that the three witnesses were taken to identify Williams within 30 minutes after the robbery. The witnesses were sitting in the back of police cars at the time of the identification; however, there was nothing obstructing their views. All three witnesses testified that they could see Williams clearly, as he was

>standing only about 20 feet away with a light shone on him. Specifically, Funk testified that she did not hesitate to identify Williams as the intruder; she looked at Williams for "a good 15 seconds" before she identified him and there was no question in her mind that he was the robber. Similarly, Casali testified that he had no hesitation when he identified Williams as the intruder. According to Casali, "I knew right away that was the person I had just seen. I probably made the identification within ten seconds." Further, Funk testified that, during the robbery, Williams was in the apartment for a total of five minutes. She said that she "distinctly" remembered Williams' eyes and eyebrows and that he had earrings. She also remembered his nose, the shape of his lips, and the shape of his face. Casali similarly testified that he remembered what the intruder's eyes and eyebrows looked like, and he remembered the intruder's facial structure and that he had two earrings in his ears. Funk and Casali denied that the police or anyone else pressured, threatened, or influenced them in any way to identify Williams as the robber. And all three witnesses testified that they had no doubt that Williams was the intruder at the time that they identified him.
>
>Therefore, we conclude that Williams was not denied due process because he has not shown, based on the totality of the circumstances, that the pretrial identification procedure was so suggestive that it led to a substantial likelihood of misidentification.

Michigan Court of Appeals decision, PageID.354-355.

The standard for determining the constitutionality of suggestive identification procedures focuses on whether under the totality of the circumstances the identification was reliable. *Neil v. Biggers*, 409 U.S. 188, 199 (1972). The Sixth Circuit stated:

>In circumstances where there was excellent opportunity for the victim to observe the offender and the identification was made promptly thereafter in the normal course of a police investigation, and under circumstances when a line-up would have been difficult or impossible, there is no per se violation of the due process clause of the Fourteenth Amendment in a one-on-one show-up.

*Hastings v. Cardwell*, 480 F.2d 1202, 1203 (1973). Under the circumstances, the officers' actions in having the victims identify Petitioner as soon as he was apprehended after the crime did not violate Petitioner's rights. The victims had the opportunity to identify Petitioner during the course

of the criminal conduct, and were able to view and identify Petitioner soon after the criminal conduct was completed.

For these reasons, it is the opinion of the undersigned, that Petitioner failed to establish cause and prejudice for his default of this issue. In the opinion of the undersigned, the decisions of the Michigan courts did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Similarly, Petitioner's claim that the jury was not properly instructed on eyewitness identification was rejected by the Michigan Court of Appeals as waived on appeal because Petitioner's counsel expressly approved the jury instructions. Moreover, the Michigan Court of Appeals concluded that counsel did not err by failing to preserve this issue:

> Williams argues that defense counsel was ineffective by failing to request that the trial court read CJI2d 7.8. However, no error occurs when the jury instruction actually given "fairly presented to the jury the issues to be tried and sufficiently protected the rights of the defendant."
>
> In this case, the trial judge instructed the jury consistent with CJI2d 3.6, which deals with the credibility of witnesses:
>
>> As jurors, you must decide what the facts of this case are. This is your job and no one else's. You must think about all the evidence and the testimony and then decide what each piece of evidence means and how important you think it is. This includes whether you believe what each of the witnesses said.
>>
>> * * *
>>
>> Since it is your job to decide which—or what the facts of the case are, you must decide which witnesses you believe and how important you think their testimony is. You do not have to accept or reject everything a

witness says. You are free to believe all, none, or part of any person's testimony. In deciding which testimony you believe, you should rely on your own sense and everyday experience.

There is really no fixed set of rules for judging whether you believe a witness, but it may help you to think about these questions. Was the witness able to see or hear clearly? How long was the witness watching or listening? Was anything else going on that might have distracted the witness? Does the witness seem to have a good memory? How did the witnesses look and act while testifying? Did the witnesses seem to be making an honest effort to tell the truth or did the witness seem to evade the questions or argue with the lawyers? Does the witness's age and maturity affect how you judge his or her testimony? Does the witness have any bias or prejudice or any personal interest in how this case is decided? Have there been any promises, threats, suggestions, or other influence that affected how the witness testified? In general, does the witness have any special reason to tell the truth or any special reason to lie? All in all, how reasonable does the witness's testimony seem when you think about all the other evidence in the case?

Sometimes the testimony of different witnesses will not agree, and you must decide which testimony you accept. You should think about whether the disagreement involves something important or not and whether you think someone is lying or is simple mistaken. People see and hear things differently and witnesses may testify honestly but simply be wrong about what they thought they saw or remembered. It's also a good idea to think about which testimony agrees best with the other evidence in the case.

However, you may conclude that a witness deliberately lied about something that is important to how you decide a case. If so, you may choose not to accept anything that witness said. On the other hand, if you think the witness lied about some things but told the truth about others, you may simple accept the part you think is true and ignore the rest.

> The trial court's instruction directed the jurors' attention to various factors that influenced the witnesses's perceptions and memories. These factors comport with the essence of CJI2d 7.8. Therefore, the instructions as given adequately protected Williams' rights. Indeed, we note that a reading of CJI2d 7.8(3) would have arguably hurt Williams' case. Paragraph 3 addresses the degree of confidence with which a witness made the identification, and all three witnesses here stated that they had no doubt that Williams was the man that robbed them. Therefore, we conclude that the instructions as given adequately protected Williams' rights, and defense counsel was not ineffective for failing to specifically request that the trial court read CJI2d 7.8.

Michigan Court of Appeals decision, PageID.360-361.

In the opinion of the undersigned, Petitioner has failed to show cause or prejudice for his default of the jury instruction issue. In order to show a constitutional violation, petitioner must demonstrate that the instruction violated due process. *Henderson v. Kibbe*, 431 U.S. 145, 153 (1977).

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," . . . not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned,'" . . . .

431 U.S. at 154. In the opinion of the undersigned, Petitioner has failed to show that the Court erred in instructing the jury. The Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner claims that his trial counsel was ineffective. To prevail on an ineffective assistance of counsel claim, a convicted defendant must demonstrate (1) that counsel's errors were so serious that counsel was not functioning as counsel guaranteed by the Sixth Amendment, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688-96 (1984). Stated another way, this court is to decide whether petitioner's trial counsel's alleged failures were such egregious errors as to constitute ineffectiveness and whether the alleged failures were materially prejudicial. The Sixth Circuit has explained:

> The question for reviewing courts is whether counsel's errors have likely undermined the reliability of, and confidence in, the result. *Lockhart v. Fretwell*, 113 S.Ct. 838, 842-43 (1993). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *Strickland*, 466 U.S. at 691, *quoted in Smith v. Jago*, 888 F.2d 399, 404-05 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). In evaluating petitioner's claim, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc), cert. denied*, 113 S. Ct. 2969 (1993). Thus, the determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was "snatched from the jaws of victory." *See id.*

*West v. Seabold*, 73 F.3d 81,84 (6th Cir. 1996).

Petitioner asserts several instances of ineffective assistance of trial counsel. Specifically, Petitioner claims that trial counsel (1) failed to request suppression of the suggestive identification, (2) failed to request a jury instruction on eyewitness identification, (3) failed to

introduce the police car video[1], (4) failed to challenge an officer's testimony about finding the earrings in Petitioner's jail locker, and (5) failed to request dismissal for lack of jurisdiction for a faulty return. Petitioner's claims regarding the police car video, the earrings, and return are procedurally defaulted, as Petitioner failed to raise those claims on direct appeal. Petitioner's first and second claims are without merit, as trial counsel was not ineffective in failing to make futile arguments or meritless claims. The Michigan Court of Appeals held:

> Williams argues that defense counsel provided him ineffective assistance of counsel when he failed move for suppression of the show-up identification testimony. However, because we find no error in the admission of the identification testimony, we conclude that defense counsel's failure to object did not constitute ineffective assistance of counsel. See *People v. Rodriguez*, 251 Mich. App 10, 29; 650 NW2d 96 (2002).

Michigan Court of Appeals decision, PageID.356. As previously stated, the Michigan Court of Appeals found that defense counsel did not err by failing to request that the trial court read CJI2d 7.8 to the jury.

Petitioner argues that if the police video was obtained by counsel it would have contradicted the identification and police testimony, that counsel failed to challenge Detective Betz's testimony that he obtained earrings from Petitioner's clothes locker, and that counsel failed to argue that the Circuit Court lacked jurisdiction due to the District Court failing to properly certify the return. Petitioner has not shown that any exculpatory evidence is contained within the video. Nor has Petitioner set forth how the video could have been helpful to his defense. In the opinion of the

---

[1] The respondent has provided the court with copies of the police car video on two Digital Versatile Discs. The video does not depict the identification of Petitioner by the victims of the crime. The video shows the outside view through the windshield of the vehicle. Petitioner is inside the police vehicle and not depicted on the video. The audio is of the interview of Petitioner after his arrest and during his drive to the police station. The video was not entered into evidence at trial.

undersigned, counsel did not err by failing to obtain or move for the admission of the video. Similarly, Petitioner fails to explain how challenging Detective Betz's testimony regarding the earrings would have led to a finding that Petitioner was not guilty of the crimes. Similarly, Petitioner has not shown how a challenge to the Circuit Court's jurisdiction would have resulted in a dismissal of the charges against him. In the opinion of the undersigned, Petitioner has failed to show that his counsel was ineffective.

Lastly, Petitioner claims that his appellate counsel was constitutionally ineffective. In the opinion of the undersigned, Petitioner has failed to show ineffective assistance of appellate counsel. An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* For the reasons previously stated, Petitioner has not shown that issues that he asserts should have been raised on appeal have merit.

In summary, the undersigned concludes that Petitioner's claims are without merit and therefore recommends that this Court dismiss the petition with prejudice.

In addition, if Petitioner should choose to appeal this action, I recommend that a certificate of appealability be denied as to each issue raised by the Petitioner in this application for habeas corpus relief. Under 28 U.S.C. § 2253(c)(2), the court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, the undersigned has examined each of Petitioner's claims under the *Slack* standard.

Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." The undersigned concludes that reasonable jurists could not find that a dismissal of each of Petitioner's claims was debatable or wrong. Therefore, the undersigned recommends that the court deny Petitioner a certificate of appealability.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

- 18 -

>                            */s/ Timothy P. Greeley*
>                            TIMOTHY P. GREELEY
>                            UNITED STATES MAGISTRATE JUDGE

Dated:  August 2, 2016